**Stanley GAGLIARDI, Individually and on behalf of all others similarly situated, Plaintiff,**

v.

**AMERICAN HOME PRODUCTS CORPORATION, A.H. Robins Company, Incorporated, and Interneuron Pharmaceuticals, Inc., Defendants.**

No. 98–C–1025.

United States District Court, E.D. Wisconsin.

Dec. 16, 1998.

Frank R. Terschan, Terschan, Steinle & Ness, Milwaukee, WI, Arthur W. Aufmann, Edward T. Joyce, Joyce & Associates, Chicago, IL, Eugene W. Beeler, Jr., Andrew H. Haber, Beeler Schad & Diamond, Chicago, IL, for plaintiff Stanley Gagliardi.

Todd Weir, Jennifer A. Slater Carlson, Otjen, Van Ert, Stangle, Lieb & Weir, Milwaukee, WI, for defendant American Home Products Corp. and A.H. Robins Co., Inc.

Mark W. Lee, Maslon, Edelman, Borman & Brand, Minneapolis, MN, William Lay, Atiba Adams, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Interneuron Pharmaceuticals, Inc.

## *DECISION AND ORDER*

CURRAN, District Judge.

Defendant American Home Products Corporation (now merged with Defendant A.H. Robins Company, Incorporated) removed this action from the Circuit Court of Kenosha County (Wisconsin) with the consent of co-Defendant Interneuron Pharmaceuticals, Inc. on the ground that this court has diversity jurisdiction over the subject matter. *See* 28 U.S.C. § 1332. Plaintiff Stanley Gagliardi is suing the Defendant on behalf of himself and all other Wisconsin residents who have taken the diet drugs fenfluramine or dexfenfluramine and have suffered or will suffer economic loss.[1] They are claiming relief for

1. The proposed class has not yet been certified. Even if it had, the damages sought by each class member could not be aggregated in order to meet the jurisdictional amount. The named plaintiff must satisfy the jurisdictional minimum. *See In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 607 (7th Cir.1997), *cert. denied sub. nom, Abbott Laboratories v. Huggins,* — U.S. —, 118 S.Ct. 1178, 140 L.Ed.2d 186 (1998), and *cert. denied sub nom. AmeriSource Corporation v. HJB, Inc.,* — U.S. —,

injuries incurred as a result of the Defendants' alleged negligent misrepresentation, strict responsibility misrepresentation, and intentional misrepresentation. Gagliardi and the putative class are seeking a judgment declaring that:

i. A plaintiff may recover damages for the costs of medical examinations and tests when, as a result of another's conduct, medical testing is, to a reasonable degree of medical certainty, necessary in order to diagnose properly the signs of a disease, although the person seeking to recover such costs has not been physically injured;

ii. Defendants are liable to Gagliardi and the class for the costs of medical examinations and tests recommended by the U.S. Department of Health and Human Services.

iii. The prosecution of an action to require the defendants to pay the cost of such medical examinations and tests for Gagliardi and the class would not bar a subsequent action by Gagliardi or any members of the class against defendants for physical injuries arising from ingestion of fenfluramine or dexfenfluramine, should such physical injuries be diagnosed in the future.

Complaint at ¶ B. Although they claim that they want to recover the cost of the diet drugs, the cost of immediate medical screening recommended by the federal government, and lost income for undergoing screening procedures, the Plaintiff and putative class are not seeking damages. Rather, they explain that: "Plaintiff seeks a declaration for himself and the class that this action for the damages they have sustained may be pursued without losing their rights to maintain another action, if at some time in the future they suffer physical injuries as a result of taking defendants' drugs." Motion for Remand and Brief in Response to Court's October 21, 1998 Order at 2.

After removal and because it appeared that the Plaintiffs are asking for an advisory opinion, the court ordered the parties to brief the issue of whether this matter is justiciable. Instead, the Plaintiffs filed a motion asking the court to remand this case to state court because the Defendants cannot prove that the amount in controversy is in excess of $75,000, and that, therefore, this court lacks diversity jurisdiction.

Having reviewed the Complaint, the court cannot find to a legal certainty that the amount in controversy or value of the declaratory judgment to the named Plaintiff—Stanley Gagliardi—does not exceed $75,000.[2] The Complaint contains no allegations concerning the cost of the drugs, the cost of medical testing already completed, the cost of medical testing in the future, or the value of lost wages. Therefore, the court has no basis for finding that the aggregate amount of these items would be $75,000 or less. Moreover, in his brief, Gagliardi says he "may move for additional relief, such as damages, if he is granted the declarations he seeks." Motion for Remand and Brief in Response to Court's October 31, 1998 Order at 6. Due to these factors, the motion to remand because the Plaintiff does not meet the amount in controversy will be denied.

This still leaves an issue as to whether this court has the jurisdiction to grant the relief the Plaintiff is seeking. The Plaintiff is asking the court to declare that the doctrines of res judicata and collateral estoppel will not bar a future action. In other words, can a federal court grant a declaration precluding a second court from applying the doctrines of claim or issue preclusion? The answer is "no." It is well-established that in federal courts the court rendering the first judgment does not have the power to determine that judgment's effect; the second court is entitled to make its own decision. *See Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equipment Corporation,* 54 F.3d 406, 409 (7th Cir.1995); *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 525–26 (7th Cir.1985). Because this is the type of advisory opinion the Plaintiff is seeking in

118 S.Ct. 1336, 140 L.Ed.2d 498 (1998), and *cert. denied sub nom. Abbott Laboratories v. HJB, Inc.,* — U.S. —, 118 S.Ct. 1337, — L.Ed.2d — (1998).

2. The court must be satisfied to a legal certainty that the Plaintiff's claim is less than the jurisdictional amount. *See Gardynski-Leschuck v. Ford Motor Company,* 142 F.3d 955, 957 (7th Cir. 1998).

this action, the court must remand this case for lack of jurisdiction. *See Pettibone Corporation v. Easley,* 935 F.2d 120, 123 (7th Cir.1991).

For these reasons, the court ORDERS that the "Plaintiff's Motion for Remand" (filed November 3, 1998) IS DENIED. The court will not remand this case on the ground that the Plaintiff is not seeking the jurisdictional amount.

IT IS FURTHER ORDERED that this action is remanded to the Circuit Court of Kenosha County for lack of subject matter jurisdiction as explained above.

IT IS FURTHER ORDERED that the Clerk of Court shall send a certified order of remand to the Clerk of the Circuit Court of Kenosha County. The state court may thereupon proceed with this case. *See* 28 U.S.C. § 1447(c).

**RURAL WATER SYSTEM # 1, an Iowa non-profit corporation, Plaintiff,**

v.

**CITY OF SIOUX CENTER, IOWA, Defendant.**

**No. C95-4112-MWB.**

United States District Court, N.D. Iowa, Western Division.

Nov. 12, 1998.

See also, 967 F.Supp. 1483.

Louis T. Rosenberg, P.C., San Antonio, TX, Randall G. Sease, Sease Law Firm, Harley, IA, for Plaintiff.

Ivan T. Webber of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND JUDGMENT REGARDING TRIAL ON THE MERITS

BENNETT, District Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* .......... 979
- A. ***The Summary Judgment Ruling*** .......... 980
- B. ***Findings Of Fact*** .......... 981
  - 1. ***Stipulated facts*** .......... 981
  - 2. ***Further findings of fact*** .......... 982
    - a. ***The RWS # 1 system*** .......... 982
    - b. ***Existing customers inside the 1989 city limits*** .......... 984
    - c. ***New customers inside the 1989 city limits*** .......... 985
    - d. ***Customers outside the 1989 city limits*** .......... 986

*II. LEGAL ANALYSIS* .......... 986
*A. Reconsideration Of The Summary Judgment Ruling* .......... 987
*1. Payne and the Bell Arthur briefs* .......... 987
*2. The import of Payne and legislative history* .......... 988
*B. The Scope Of RWS # 1's § 1926(b) Protection* .......... 988
*1. The import of the court's summary judgment ruling* .......... 988
*2. The Vande Berg Scales trade* .......... 989
*3. Service and encroachment outside the 1989 boundary* .......... 991
*a. Matters of geography and timing* .......... 991
*b. Adequacy of service* .......... 992
*i. Fire protection* .......... 992
*ii. Capacity, pressure, and storage* .......... 994
*C. State Law Claims* .......... 995
*1. Tortious interference* .......... 995
*2. Conversion* .......... 996
*3. Inverse condemnation* .......... 999
*D. Remedies* .......... 1000

*III. CONCLUSION* .......... 1002

Trial on the merits is the second major battle in this "turf war" between a non-profit corporation and a municipality over which entity is entitled to distribute water in a disputed territory surrounding the municipality. In the first major battle, on the parties' cross-motions for summary judgment, the court clarified—or thought it clarified—precisely what territory is still in dispute and what issues remained to be tried. *See Rural Water Sys. # 1 v. City of Sioux Center, Iowa,* 967 F.Supp. 1483 (N.D.Iowa 1997). After pre-trial briefing, a bench trial that lasted several days and involved the presentation of voluminous exhibits—such as maps detailing the location, size, flows, and pressures of pipelines and the location of disputed customers—post-trial briefing, and closing arguments, the court can safely say that, although perhaps no wiser, it is considerably better informed. The court must now try to end this turf war by apportioning territory and ordering reparations, if appropriate.

## *I. INTRODUCTION*

Plaintiff Rural Water System # 1 (RWS # 1), a non-profit corporation, filed the original complaint in this lawsuit on November 2, 1995, and an amended complaint on October 22, 1996, against defendant City of Sioux Center, Iowa (the City), alleging generally violations of 7 U.S.C. § 1926(b), which protects rural water associations indebted to the United States from encroachment on their service areas by adjacent municipalities. In addition, RWS # 1 asserts three state-law claims: tortious interference with prospective business advantage, conversion of property, and inverse condemnation. All of RWS # 1's claims allegedly arise from the City's annexation of portions of RWS # 1's asserted service area, the City's demands that it, not RWS # 1, supply the water needs of customers in the annexed areas and within two miles of the City's new boundaries, and the City's actual service to some of the customers in the disputed area, which RWS # 1 alleges resulted in "curtailment" or "limitation" of RWS # 1's federally-protected service area. As relief, RWS # 1 requests preliminary and permanent injunctions prohibiting the City's curtailment of RWS # 1's service area in violation of 7 U.S.C. § 1926(b); declaratory judgment concerning the rights of the parties to serve the disputed area and alleged violations of state and federal law; equitable relief; damages, both compensatory and punitive; and attorney's fees and costs. The issues for trial were clarified by the court's ruling on cross-motions for summary judgment on May 27, 1997.

This matter proceeded to trial beginning on May 11, 1998, and concluding on May 14, 1998. Closing arguments, however, were not held until October 29, 1998. At closing arguments, as at trial, plaintiff RWS # 1 was represented by lead counsel Louis T. Rosenberg of Louis T. Rosenberg, P.C., in San Antonio, Texas, who argued the case on behalf of RWS # 1, and local counsel Randall G. Sease of the Sease Law Firm in Hartley,

Iowa. Defendant City of Sioux Center, Iowa, was represented by counsel Ivan T. Webber of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., in Des Moines, Iowa.

***A. The Summary Judgment Ruling***

Because the court's ruling on the parties' cross-motions for summary judgment, *Rural Water Sys. # 1 v. City of Sioux Center, Iowa,* 967 F.Supp. 1483 (N.D.Iowa 1997), framed the factual and legal issues for trial, the court will recapitulate the conclusions in that ruling here. In the summary judgment ruling, the court considered, *inter alia,* the requirement that the entity seeking protection under § 1926(b) be indebted to the United States at the time of the alleged curtailment of its protected service area.[1] After examining the record concerning RWS # 1's "buy out" of its notes to the United States,[2] and interpretation of the pertinent statutory provisions governing that "buy out,"[3] the court concluded that RWS # 1 lost the protections of § 1926(b) when it bought back its notes in 1988 and did not regain such protections until RWS # 1 again became indebted to the United States in 1992. Consequently, the court concluded that RWS # 1 could not state a claim that the City violated § 1926(b) when it annexed portions of the disputed territory in 1989, because RWS # 1 simply had no protection of § 1926(b) to assert against that annexation. The court therefore granted summary judgment in favor of the City on any part of any claim in which RWS # 1 asserted that the City's expansion to its 1989 city limits involved a curtailment or limitation of RWS # 1's service area in violation of § 1926(b), and denied that part of RWS # 1's cross-motion for summary judgment asserting that the City's expansion to its 1989 city limits violated § 1926(b).

The question of whether curtailments or threatened curtailments of RWS # 1's service area occurred in violation of § 1926(b) after July 1, 1992, when RWS # 1 again became indebted to the United States, the court concluded, would have to await resolution upon trial on the merits. The court concluded that RWS # 1's service area, where it "made service available," must be determined by the coincidence of RWS # 1's legal right or authority to serve, a matter of state law, and its physical ability to serve, a matter of fact determined by the "pipe-in-the-ground test" established by federal precedent. The court found that the Iowa statute the City contended established RWS # 1 had no legal right to serve within two miles of the City's 1989 city limits, IOWA CODE § 357A.2, is not applicable to an entity such as RWS # 1, which is not a "special water district," but has instead remained a water service association.

Therefore, the court concluded, the question of the extent of RWS # 1's protected service area turns on RWS # 1's physical ability to serve portions of its service area. Where RWS # 1 was physically able to serve, however, was the subject of genuine issues of material fact. In particular, the court found that the City had generated genuine issues of material fact as to whether RWS # 1 had an agreement with the City that one of its lines would be only a dedicated transmission line, thus excluding that line from defining where RWS # 1 physically made service available. Other fact questions persisted as to RWS # 1's physical ability to serve the entirety of the area outside of the City's 1989 boundaries that RWS # 1 claims is protected by § 1926(b).

1. The statutory provision upon which RWS # 1's federal claim is based provides as follows:

> **(b) Curtailment or limitation of service prohibited**
>
> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area *during the term of such loan;* nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b) (emphasis added).

2. RWS # 1's pay-off of its federal loans in 1988 was pursuant to the Omnibus Budget Reconciliation Act (OBRA) of 1986 and the Agricultural Credit Act of 1987(ACA), which amended the 1986 OBRA by providing for a "Buy Out Program" of FmHA loans.

3. The pertinent provisions are subsections (f) and (g) of 7 U.S.C. § 1929a *note.*

Consequently, the court denied the cross-motions for summary judgment to the extent not otherwise resolved, and stated that this matter would proceed to trial on the question of the extent of RWS # 1's physical ability to serve all portions of its asserted service area *outside* of the City's 1989 city limits and the City's encroachment upon any protected service area. The findings of fact, which follow, are molded to address the remaining questions identified in the summary judgment ruling.

***B. Findings Of Fact***

These findings of fact are not meant to be exhaustive. They are intended instead to provide the necessary context for the legal analysis that follows. Further findings of fact, where necessary, appear in that legal analysis. These findings of fact begin with the parties' stipulation of facts in the final pretrial order.

***1. Stipulated facts***

RWS # 1, a non-profit corporation created pursuant to IOWA CODE CH. 504A on May 6, 1969, operates as a retail water service corporation. RWS # 1 began providing or making services available in 1972 to a general area approximately eighteen miles by thirty-six miles, and including thirteen townships, in Sioux County, Iowa, and six townships in O'Brien County, Iowa. RWS # 1 completed installation of its pipes in its first rural area (Phase III area) in 1975 and 1976. Although RWS # 1's building projects were financed by the Farm Home Administration (FmHA), RWS # 1 was not indebted to FmHA from September 22, 1988—after participating in a buy out authorized by the Omnibus Budget Reconciliation Act (OBRA) of 1986 and the Agricultural Credit Act of 1987(ACA)—until July 1, 1992. However, on July 1, 1992, and again in 1995, RWS # 1 became reindebted to the FmHA for a total of $2,030,000. In 1992, the City was aware that RWS # 1 was requesting a $1.7 million loan from the FmHA to fund improvements to RWS # 1's Water Treatment Plant No. 2, which is just outside and to the west of Sioux Center. The parties do not dispute that RWS # 1 is "an association" within the meaning of § 1926(b), and that as of July 1, 1992, RWS # 1 had a qualifying outstanding obligation to the FmHA.

The City of Sioux Center is a municipal corporation organized under Iowa law and located in Sioux County, Iowa. It also operates a water supply system, as a municipal utility, and supplies customers inside its city limits. The City has from time to time contracted with RWS # 1 for water treatment and the parties have been involved in other joint uses of facilities. Specifically, the City has paid RWS # 1 to treat City well water to bring it to a certain grade or quality pursuant to a 5-year agreement entered into in 1992.

On December 22, 1989, the City annexed 1,620 acres outside of its 1975 city limits. These 1,620 acres of land included territory in which RWS # 1 had previously supplied water or had laid pipes and built other facilities. RWS # 1 had certain installations and facilities in place between the City's pre-existing 1975 boundary and its 1989 boundary, some of which existed around the peripheral areas of what became the 1989 boundary. RWS # 1 continues to supply water to some customers now inside the City's 1989 city limits. On October 1, 1990, the City also voluntarily annexed 2.88 acres of land adjacent to its 1989 boundaries. In December of 1995, the City annexed another twenty acres, known as "the Byl Subdivision," by voluntary annexation. Next, in March of 1996, the City annexed an additional 0.41 acres north of its 1990 annexation by voluntary annexation. Between the City's 1989 boundary and its present boundary, RWS # 1 has an investment and facilities in place.

RWS # 1 has at times advised the City of requests for connection to the rural water system from customers within two miles of the City's 1989 city limits and has asked the City to advise RWS # 1 whether the City or RWS # 1 should supply the customer. In June of 1994, the City installed a water line mainly along Harrison Avenue/13th Avenue Southeast, which street is the eastern city limit of Sioux Center. The installation of this water line was performed by contractor Jim Mouw, doing business as Jim's Digging Service. In 1996, Mr. Mark Donnell, a resident of the Byl Subdivision, paid Mr. Mouw to install a water line that crossed RWS # 1's line, crossed over to the west side of Harri-

son Avenue, and connected with the City's newly-constructed 8–inch waterline, which runs parallel to RWS # 1's line, installed in 1975, and already in place in Mr. Donnell's front lot.

### 2. *Further findings of fact*

#### *a. The RWS # 1 system*

In addition to the above facts, to which the parties have stipulated, the court finds the following facts have been proved from the evidence presented at trial. The following map, a miniaturization of Plaintiff's Trial Exhibit 114A, may be of assistance to understanding various matters discussed in this ruling. The actual trial exhibit, however, included handwritten identifications of various customers and other notations made by witnesses in the course of trial. On this map, RWS # 1's customers are shown as squares and the City's customers are shown as circles; the City's 1975 and 1989 boundaries are shown as dashed lines; and RWS # 1's water lines (in colors in the trial exhibit) are shown as solid lines with indications of their diameters in inches.

All of RWS # 1's easements for pipeline were acquired by agreements with landowners or municipalities: RWS # 1 does not have the power to condemn rights-of-way or easements for its pipelines. Thus, nearly all of RWS # 1's pipeline, when laid, ran through private rural land, roughly parallel to, but just outside, the 1975 city limits of Sioux Center, or roughly paralleled the 1975 city limits at a distance. In 1975, RWS # 1's pipeline formed a rectangle around Sioux Center, and was contiguous to the city limits only for a short portion of Harrison Avenue/13th Avenue N.E. on the east, and a very short portion of Grant Avenue/13th Avenue N.W. on the west. However, since the City's annexation of 1,620 acres in 1989, RWS # 1's pipeline runs along, partly inside and partly

outside, the eastern city limit, the northern city limit, and a slightly longer portion of the western city limit than was the case in 1975.[4] On the south, RWS # 1 has an 8–inch transmission line from its Treatment Plant No. 2 to the west of the City to its reservoir to the east of the City, built in 1988, that runs east-west for most of its course, partly through the annexed area where it formerly paralleled the 1975 city limit, and partly parallel to, but outside, of the new 1989 boundary in an area along 410th Street/20th Street S.E. east of U.S. Highway 75. The City has never condemned, disturbed, or interfered with the function of any portion of RWS # 1's pipeline that eventually came within City limits, although RWS # 1 contends that the utility of some of its lines has been impaired because they can no longer serve additional customers.

The undisputed testimony at trial, from witnesses for both RWS # 1 and the City, was that the 8–inch water line RWS # 1 installed in 1988 adjacent to the City's 1975 southern boundary was intended to be and in fact is used solely or strictly for transmission of water from RWS # 1's treatment plant to the west of the City to its reservoir to the east, not as a service line. RWS # 1 contends that this line could, however, be used to enhance pressure and flow for fire protection, and that it could be tapped for fire hydrants, a matter the court need not resolve. However, in the same trench with the 8–inch dedicated transmission line, RWS # 1 also laid a 2–inch service line for a short distance crossing and then running east and west of U.S. Highway 75, a fact not presented in the summary judgment record. This service line was connected to a pre-existing 3–inch service line, laid in about 1975 or 1976, not to the 8–inch dedicated transmission line laid in 1988. The City protested the installation of this 2–inch service line, at the time it occurred, as contrary to an agreement between the parties that only a transmission line would be laid in 1988 along 410th Street. As a practical matter, this 2–inch service line does not now and never has serviced any customers. Jean Still, the manager of RWS # 1 testified that the 2–inch service line was laid at the same time as the 8–inch dedicated transmission line, because of the expense and difficulties of obtaining permits and making installations when a water line crosses a highway, such as U.S. Highway 75. The 2–inch service line has never serviced customers, because adjacent territory RWS # 1 anticipated servicing from it was annexed by the City in 1989, a year after the line was built.

The RWS # 1 pipeline system is designed to provide only potable running water for rural customers, including residences, business, and farmsteads. It is not designed specifically for, and has never been required by state or federal regulations or permit-issuing or funding agencies to provide, fire flow protection. Experts for both parties agreed, and the court finds, that RWS # 1 was not required to provide fire flow protection by any existing regulations of any governing entity. Indeed, Jean Still testified that she had not heard much about fire flow until this litigation, although she testified that, if required, she believed the RWS # 1 system could provide adequate fire flow either now or within a reasonable time with some modifications. There is no evidence that at any time RWS # 1 has failed to provide potable running water to any customer or service area nor is there any evidence that any customer or regulating body has ever complained that RWS # 1 did not provide such water at an adequate pressure.

The court therefore turns to the circumstances under which certain customers were transferred between RWS # 1 and the City or were connected to City water instead of the RWS # 1 system. This review begins with customers inside the City's 1989 city limits, then turns to customers outside of the City's 1989 limits.

### *b. Existing customers inside the 1989 city limits*

Relatively few customers brought within the city limits by the 1989 annexation actually changed from RWS # 1 water service to City water. RWS # 1 has retained fourteen pre-existing customers who now lie within the City's 1989 city limits. The City has not

4. The majority of the City's 1989 annexation was to the east, north, and south, with only a small area just south of 390th Street/7th Street N.W. added to the "panhandle" on the west.

solicited nor asserted a right to serve any of these customers. However, in 1991, during the period when RWS # 1 was not indebted to the United States, RWS # 1 "sold" five customers to the City as the result of arm's-length negotiations. Those five customers included Marlin Altena, Cornie DeVos, and Norman Sneider, all located just within the southwest corner of the "panhandle" on the west side of the City, outside of the 1975 city limit, but within the 1989 city limit. The remaining two customers in this group of five were Dr. Daryl J. Funk and Dr. C.M. Bleeker, both located on the east side of the City, south of 390th Street and west of Harrison Avenue, in an area around which the 1975 city limit made a "jog," but within the 1989 city limit. These five customers were disconnected from RWS # 1 service in May and June of 1991, and the City made payment of $2,815.35 to RWS # 1 for these customers on July 8, 1991.

Another customer within the City's 1989 boundaries but serviced by RWS # 1 was the subject of a "trade" between the City and RWS # 1. That customer is Vande Berg Scales, which had been a customer of RWS # 1 since 1977. The Vande Berg Scales property was in a small square of territory in the "panhandle" on the west side of the City to the north of 390th Street that was not within the City's 1975 city limits, but which was annexed in 1989.[5] After annexation, RWS # 1 continued to serve Vande Berg Scales until 1994, when the proprietor expressed an interest in changing to City water, because City water was cheaper. By this time, RWS # 1 was re-indebted to the FmHA. The other customer involved in the "trade," Tom Sandbulte, was building a home to the east of the City's 1989 city limits just north of 400th Street/9th Street S.E. and east of Harrison Avenue, *i.e.*, outside of the city limits. At this time, the City was still asserting—erroneously, this court held on summary judgment—that it had an exclusive right to serve customers within two miles of its city limits. Several properties in the area where Mr. Sandbulte was building his home were already serviced by RWS # 1, but the City asserted a right to serve Mr. Sandbulte's new home. RWS # 1—acting under the same misapprehension as the City—had made a practice of acknowledging the City's claim to a two-mile exclusivity zone at least to the extent of asking the City which entity should serve water customers in that zone, and did so in Mr. Sandbulte's case. The parties worked out a deal whereby RWS # 1 traded an apparently dissatisfied existing customer within the city limits, Vande Berg Scales, to the City for the "right" to serve a new customer outside of the city limits, Mr. Sandbulte. RWS # 1 did not obtain FmHA approval for such a trade.[6] Thus, since 1994, Vande Berg Scales has obtained its water service from the City, and Tom Sandbulte has obtained his water service from RWS # 1.

### *c. New customers inside the 1989 city limits*

"New" customers within the 1989 city limits who were connected to City water instead of RWS # 1 service were the following, beginning in the north and moving clockwise around the City: "Vande Berg Chicken," south of 380th Street/20th Street N.E.; Mr. Van Clyde and Mr. Horstman, just west of Harrison Avenue near Dr. Funk and Dr. Bleeker; Chuck Gue and an unidentified customer just north of 410th Street/20th Street S.E. near the southeast corner of the City's 1989 boundaries; Mr. Vermeer, Mr. Wichers, and Mr. Raak, just south of 410th Street/20th Street S.E. and east of U.S. Highway 75; and Mr. Byker, south of the Vermeer–Wichers–Raak group and near RWS # 1's 3–inch service line running south from the city parallel to U.S. Highway 75.

Although Mr. Vande Berg obtained water for his residence from RWS # 1, he obtained water from the City for his chicken houses after the 1989 annexation. The record is silent as to whether Mr. Vande Berg had previously obtained water for his chicken houses from RWS # 1. Thus, RWS # 1 has failed to prove that it "lost" an existing cus-

5. The parties agree that the location of Vande Berg Scales is incorrectly shown on Exhibit 114A as outside of the square of territory referred to above, when it is in fact inside that square.

6. The court will consider in its legal analysis whether such approval was required and the significance of failing to obtain such approval if it was required.

tomer as the result of annexation and service to "Vande Berg Chicken" by the City.

The record, including the testimony of Jean Still, shows that Mr. Van Clyde and Mr. Horstman "came on" to City water service after RWS # 1 "sold" the right to serve the nearby properties of Drs. Bleeker and Funk to the City. Again, the record is silent as to whether Mr. Van Clyde and Mr. Horstman had previously obtained water from RWS # 1. Thus, RWS # 1 has failed to prove that it "lost" existing customers and the court finds instead that these were "new" customers within the City's 1989 limits.

Jean Still testified that Mr. Gue and the unidentified customer "could have been" RWS # 1's customers, apparently because they were located near RWS # 1's 3-inch service line, "if [the City] hadn't annexed out there." These customers, however, were also within the City's 1989 city limits at the time they sought service. The same applies to Mr. Vermeer, Mr. Wichers, Mr. Raak, and Mr. Byker, all of whom, it appears from the record presented at trial, only sought water service after the 1989 annexation, and then obtained service from the City. Thus, RWS # 1 has failed to prove that it "lost" existing customers and the court finds instead that these were also "new" customers within the City's 1989 limits.

***d. Customers outside the 1989 city limits***

Turning to customers outside of the City's 1989 limits, although the City's waste water treatment plant was built after 1989 outside of its city limits, RWS # 1 does not assert that it ever intended or expected to service that plant as a customer. The City has always provided potable water to the waste water treatment plant. The court concludes that service of potable water to the City's waste water treatment plant is not in dispute.

The 2.88 acres the parties agree was annexed on October 1, 1990, is the property known throughout this litigation as the "Carriage House" property, on which stands a group of apartments. The "Carriage House" property lies just to the east of Harrison Avenue and to the south of 390th Street. It was sold for development by Mrs. Sneller, and is the southernmost of the three "Sneller" properties at issue in this litigation. The City has always provided water service to the Carriage House. At the time of annexation and the commencement of City water service to the Carriage House, RWS # 1 was not indebted to the United States. The middle of the "Sneller" properties still belongs to Mrs. Sneller, although she built a new house on the property in 1994 and the parties dispute who had the right to serve that new residence. Mrs. Sneller's original residence was never served by RWS # 1—it was in fact serviced by the City—and her new residence is also served by the City. Unlike the Carriage House property, the City commenced water service to Mrs. Sneller's new home at a time when RWS # 1 was again indebted to the United States. This "Sneller" property is the 0.41 acres north of the City's 1990 annexation that the parties agree was annexed in March of 1996, at a time when RWS # 1 was indebted to the United States. The northernmost of the "Sneller" properties is a property sold to Mr. Vander Vegt. The Vander Vegt property is 2.22 total acres annexed by the City on October 6, 1997. Mr. Vander Vegt began receiving water service from the City after annexation at a time when RWS # 1 was indebted to the United States. The parties do not dispute that RWS # 1 has service lines available to serve all three of these "Sneller" properties, although the City is currently serving all three.

The remaining customers in dispute outside of the City's 1989 city limits are the residents of the Byl Subdivision, which, as noted above in the recitation of the parties' stipulation of facts, was annexed by the City in December of 1995. The City installed an 8-inch water line to the Byl Subdivision and began providing service there in 1996 even though RWS # 1 has a 5-inch service line that crosses the front of each of the four lots in the subdivision. The court finds that the Byl Subdivision was annexed, and the City began providing water service there, at a time when RWS # 1 was indebted to the United States.

## *II. LEGAL ANALYSIS*

***(including some further findings of fact)***

The court's legal analysis must be made in several phases, sometimes coupled with outcome determinative findings of fact. In the

first phase, the court must consider RWS # 1's implied invitation to reconsider its summary judgment ruling. Contrary to the summary judgment ruling, RWS # 1 appears to urge the court to find that RWS # 1 is entitled to the protection of § 1926(b) from loss of customers resulting from the City's 1989 annexation, and hence can claim as protected territory the area between the City's 1975 and 1989 city limits. Next, the court must consider whether various customers fall within RWS # 1's federally-protected service area, in light of both RWS # 1's legal right and physical ability to serve those customers. The court must then consider RWS # 1's state-law claims of tortious interference with prospective business advantage, conversion of property, and inverse condemnation. Finally, if RWS # 1 prevails on any of its claims, the court must consider the appropriate remedies.

### A. Reconsideration Of The Summary Judgment Ruling

■ As mentioned above, RWS # 1 appears to invite the court, at least implicitly, to reconsider its summary judgment ruling and find that RWS # 1 is entitled to the protection of § 1926(b) from loss of customers resulting from the City's 1989 annexation. This invitation comes from RWS # 1's post-trial brief, calling the court's attention to the decision of the Fourth Circuit Court of Appeals in *Payne v. Federal Land Bank of Columbia*, 916 F.2d 179 (4th Cir.1990), and the briefs on appeal to the Fourth Circuit Court of Appeals of the decision of the district court in *Bell Arthur Water Corp. v. Greenville Utilities Comm'n*, 972 F.Supp. 951 (E.D.N.C.1997). RWS # 1 asserts that *Payne* and arguments premised upon it demonstrate that RWS # 1 was entitled to the continued protection of § 1926(b) even after it bought out its notes to the FmHA in 1988 until it became re-indebted to the United States in 1992, the period the court has determined was a hiatus in RWS # 1's § 1926(b) protection. The invitation for reconsideration comes as well, and less directly, from RWS # 1's continued reference to the area between the City's 1975 city limits and its 1989 city limits as the "disputed territory," when this court's summary judgment ruling specifically identified the remaining disputed territory as that *outside* of the City's 1989 city limits. At trial, RWS # 1 presented copious evidence, much of which would otherwise be irrelevant, at least to RWS # 1's federal claim, concerning customers and service lines between the City's 1975 and 1989 city limits, including anticipated new customers in that area, apparently in support of RWS # 1's contention that it was entitled pursuant to § 1926(b) to serve all customers between the old and new city limits, as well as those outside of the 1989 city limits. The court will indulge RWS # 1's desire for reconsideration only briefly.

#### 1. Payne and the Bell Arthur briefs

RWS # 1 argues that the *Payne* decision teaches that the focus of statutory construction is the conference committee report and that the decision also explains a federally created right of first refusal under the Agricultural Credit Act of 1989 (the 1989 ACA). However, the court finds that the *Payne* decision is at best only marginally relevant. The provision of the 1989 ACA in question in *Payne* was 12 U.S.C. § 2219a, which provides that where agricultural real estate is acquired by a federal institution as a result of a loan foreclosure, the land is subject to a right of first refusal of the previous owner to repurchase or lease the property. *See Payne*, 916 F.2d at 180 & n. 1. Thus, the provision in question has nothing whatever to do, in the first instance, with what RWS # 1 describes as a "right of first refusal" of an indebted rural water association to buy out its bonds with the United States pursuant to the 1987 ACA and 1986 OBRA "Buy Out Program" of FmHA loans or the interpretation of the statutory provisions pertinent to the buy out program at issue in this case, subsections (f) and (g) of 7 U.S.C. § 1929a *note*. Nor is the language of the statute at issue in *Payne* comparable in some way to the language of the provisions of subsections (f) and (g) of 7 U.S.C. § 1929a *note*, such that comparison of the language of the two statutes suggests an interpretation of the statute at issue here that is different from this court's interpretation offered upon cross-motions for summary judgment.

Furthermore, the *Payne* decision does not establish that the "focus" of statutory inter-

pretation is the conference committee report, as RWS # 1 suggests. Rather, the court in *Payne,* as did the court in this case, noted that "the origin of any statutory construction is the statute itself." *Payne,* 916 F.2d at 181; *and compare Rural Water Sys. # 1,* 967 F.Supp. at 1516–17 ("When the language of the statute is plain, the inquiry also ends with the language of the statute," quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). As did this court in construing subsections (f) and (g) of 7 U.S.C. § 1929a *note,* the Fourth Circuit Court of Appeals in *Payne* found that the language of the pertinent subsections of 12 U.S.C. § 2219a were "clear and need[ ] no construction." *Id.; and compare Rural Water Sys. # 1,* 967 F.Supp. at 1517–20.

Furthermore, like this court, the Fourth Circuit Court of Appeals found that if plain meaning of the statutory language "were not enough, ... the legislative history bolsters [the court's] conclusion." *Id.* at 182; *and compare Rural Water Sys. # 1,* 967 F.Supp. at 1521–22. In this regard, the Fourth Circuit Court of Appeals did observe that "[t]he part of legislative history which is given the most weight is the conference report." *Id.* Hanging its hat on this observation, RWS # 1 points, in the *Bell Arthur* briefs, to a portion of the Joint Explanatory Statement of the Committee of Conference concerning subsections (f) and (g) of 7 U.S.C. § 1929a *note*—a portion to which RWS # 1 failed to draw this court's attention at the summary judgment phase of these proceedings—in which the committee observed that "[t]he Senate amendment will provide that Section 306(b) of the Consolidated Farm and Rural Development Act must be applicable to all notes or other obligations sold or intended to be sold under Section 1001. (Sec.1001(a).)." Joint Explanatory Statement of the Committee of Conference, 3097–8. RWS # 1 also points to the House Conference Report No. 100–190, which states that "[t]he Conferees intend that issuers of notes and obligations being sold under the requirement of the Budget Reconciliation Act of 1986 be given an opportunity to purchase any unsold obligations and notes for 30 days prior to the announcement of any public offerings." House Conf. Report No. 100–190.

### 2. *The import of Payne and legislative history*

However, this court has already considered the import of virtually identical pronouncements from the legislative history, those of Senator Boren, the sponsor of the amendment that became subsection (g), and has concluded that nothing in them is clearly supportive of RWS # 1's interpretation of subsection (g) or plainly contrary to the court's. *See Rural Water Sys. # 1,* 967 F.Supp. at 1522–23. RWS # 1's new authority and new arguments simply do not require a different result. Rather, as the court concluded on cross-motions for summary judgment, relying on the plain meaning of the statutory provisions in question and the legislative history, subsection (g) of 7 U.S.C. § 1929a *note* does not extend § 1926(b) protection to an issuer who has bought out its notes from the United States pursuant to the 1986 OBRA and 1987 ACA, thereby extinguishing its notes, and who consequently is no longer indebted to the United States. *See id.* at 1523 & 1534–35.

## B. *The Scope Of RWS # 1's § 1926(b) Protection*

The second phase of the court's legal analysis requires the court to consider whether various customers fell within RWS # 1's federally-protected service area, in light of both RWS # 1's legal right and physical ability to serve those customers. This phase of the court's analysis begins with the import of the court's summary judgment ruling, as reaffirmed above.

### 1. *The import of the court's summary judgment ruling*

Because the court finds no reason to retreat from its statutory interpretation and consequent conclusions on summary judgment, the court must reiterate the impact of its conclusions upon the decisions remaining to be made at trial. RWS # 1 lost the protections of § 1926(b) when it bought back its notes in 1988 and did not regain such protections until RWS # 1 again became indebted to the United States on July 1, 1992. Consequently, RWS # 1 cannot state a claim that the City violated § 1926(b) when it annexed portions of the supposedly disputed

territory in 1989, and made further annexations prior to July 1, 1992, because RWS # 1 simply had no protection of § 1926(b) to assert against that annexation.

*In other words, by serving any new customers within the City's boundaries as of July 1, 1992, the City did not—and will not—violate § 1926(b). Nor did purchases of customers within the City's boundaries as of July 1, 1992, while RWS # 1 was not indebted to the FmHA, in any way violate § 1926(b). RWS # 1 simply cannot assert that any part of its federally-protected service area after July 1, 1992, includes any area within the City's boundaries as of that date except for customers within that area that RWS # 1 was already serving on that date.*

More specifically, the court finds that RWS # 1 has failed to prove that after July 1, 1992, it lost any customers it was already serving within the City's boundaries on July 1, 1992, *with the exception of Vande Berg Scales,* which will be discussed separately below. The record shows that RWS # 1 has retained fourteen such customers. The City has not solicited nor asserted a right to serve any of these fourteen customers and therefore has not attempted to encroach upon or "curtail" RWS # 1's existing service area as to these customers in violation of § 1926(b). The court finds that the City's notice to customers of their annexation by the City with the addresses or phone numbers to contact if City services are desired does not constitute "solicitation" of RWS # 1's customers or threatened "curtailment" of RWS # 1's service area. In point of fact, no "curtailment" occurred, because no existing customers, apart from Vande Berg Scales, changed to City water service.

RWS # 1 has no claim for loss of five existing customers within the City's 1989 city limits—Marlin Altena, Cornie DeVos, Norman Sneider, Dr. Daryl J. Funk, and Dr. C.M. Bleeker—that it "sold" to the City in 1991 during the hiatus in its § 1926(b) protection. The court concludes that this sale was an arm's-length transaction between parties who, at that time, were not subject to any legal impediment that would have prevented such a sale.

Nor does RWS # 1 have any claim for loss of "new" customers within the City's 1989 limits—"Vande Berg Chicken," Mr. Van Clyde, Mr. Horstman, Chuck Gue, an unidentified customer just north of 410th Street/ 20th Street S.E. near the southeast corner of the City's 1989 boundaries, Mr. Vermeer, Mr. Wichers, Mr. Raak, and Mr. Byker. At the time these customers were added by the City, the City, not RWS # 1, had the legal right to serve them, because they were within the City's limits. Therefore, as to these customers, RWS # 1 cannot satisfy the first requirement for § 1926(b) protection, a legal right to serve. *See Rural Water Sys. # 1,* 967 F.Supp. at 1524 & 1527 & 1535.

Nor did RWS # 1's new indebtedness on July 1, 1992, somehow revivify its federal protection for service area within the City's limits as of July 1, 1992, protection RWS # 1 had lost owing to annexations, sales, or trades while it was *not* indebted to the United States. This is so, again, because as to such customers and service area, RWS # 1 cannot satisfy the first requirement for § 1926(b) protection, a legal right to serve. *See Rural Water Sys. # 1,* 967 F.Supp. at 1524 & 1527 & 1535. Rather, the legal right to serve such customers lay (and lies) with the City. Proximity of pipelines or "pipe in the ground" cannot "trump" loss of a legal right to serve. *See id.* at 1526. Therefore, RWS # 1 has no claim for any prospective customers within the City's limits as those limits existed on July 1, 1992. Consequently, much of RWS # 1's evidence of supposed acts of curtailment by the City *within the City's boundaries of July 1, 1992,* is irrelevant, because there was no service area of RWS # 1 within those boundaries to be curtailed beyond RWS # 1's existing customers, all but one of which, Vande Berg Scales, RWS # 1 has retained.

### 2. *The Vande Berg Scales trade*

The "trade" of Vande Berg Scales for Tom Sandbulte, although an arm's-length transaction between the parties like the "sale" of other customers discussed above, occurred in a significantly different factual and legal context. This "trade" occurred in 1994, when RWS # 1 was again indebted to

the United States, and thus constitutes loss of an existing customer, Vande Berg Scales, who *was* part of RWS # 1's federally-protected service area. The bargain was a bad one, because the City actually had no right to serve Tom Sandbulte, whose new residence was outside the City's limits, while RWS # 1 got nothing more than it was already entitled to and gave away something it was entitled to keep. However, the value of the bargain is not what determines its legality or illegality under § 1926(b). The question is whether RWS # 1 could bargain away an existing customer while it was indebted to the United States.

The City contends that RWS # 1 is estopped by its bargain to complain of the transfer of Vande Berg Scales to City water service. The City contends further that such a trade was permissible under § 1926(b), because a "customer" is not a "facility" that an indebted association is prohibited from transferring or encumbering without written consent of the United States pursuant to 7 C.F.R. § 1942.17(n)(2)(xii).[7] RWS # 1 contends that such estoppel would be contrary to public policy, and thus stands as no bar to its assertion of illegal curtailment resulting from the trade, citing *Jennings Water, Inc. v. City of North Vernon*, 895 F.2d 311, 314 (7th Cir.1989).

The *Jennings Water* decision is the only one the court and parties have identified that addresses directly the impact of estoppel on § 1926(b) protection in a pertinent way. In *Jennings Water*, CSL, a private, not-for-profit utility that had obtained water from Jennings Water, Inc., asserted that Jennings Water was estopped to assert § 1926(b) protection from loss of CSL as a customer, because Jennings Water had not objected when CSL announced that it would purchase water elsewhere. *Jennings Water, Inc.*, 895 F.2d at 313 & 316. The Seventh Circuit Court of Appeals concluded, first, that CSL had at best a weak case for estoppel under the "private party litigation model," because CSL could not show a reasonable belief that § 1926(b) protection would not be asserted by the FmHA against its purchase of water from a source other than Jennings Water. *Id.* at 316–17. However, the court ultimately concluded that estoppel, in these circumstances, was not available because it would violate public policy. *Id.* at 317–18. The court's succinct conclusions were as follows:

In this case, application of equitable estoppel based on Jennings' actions would allow a private contract for the sale of water between North Vernon and CSL effectively to trump section 1926(b). As discussed *supra,* the primary beneficiaries of section 1926(b)'s ban on association service curtailment are not the associations themselves, but rather, the FmHA and the individual rural consumers who would not have inexpensive and reliable water service without FmHA-supported rural water associations. *See generally [City of Madison, Miss. v.] Bear Creek Water [Ass'n, Inc.]*, 816 F.2d [1057,] 1060 [ (5th Cir. 1987) ]. Accordingly, Jennings' section 1926(b) action for injunctive relief cannot be barred by equitable estoppel.